IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KIMBERLY BESS,

       Plaintiff,

v.                                                   Civil Action No. 5:13-CV-103

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

       Defendant.

**REPORT AND RECOMMENDATION**

**I. INTRODUCTION**

**A. Background**

On August 8, 2013, Kimberly Bess filed this action under 42 U.S.C. §§ 405(g) for judicial review of an adverse decision of the Commissioner of Social Security denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 401-433.[1] The Commissioner filed her Answer on October 21, 2013.[2] Ms. Bess then filed her Motion for Summary Judgment on November 28, 2013,[3] and the Commissioner filed her Motion for Summary Judgment on December 24, 2013.[4] The motions are now ripe for this Court's review, and for this report and recommendation.

**B. The Pleadings**

1. Ms. Bess's Motion for Summary Judgment and Memorandum in Support.

---

[1] Docket No. 1.

[2] Docket No. 6.

[3] Docket No. 12.

[4] Docket No. 13.

2. Commissioner's Motion for Summary Judgment and Memorandum in Support.

**C. Recommendation**

I recommend that:

1. Ms. Bess's Motion for Summary Judgment be **DENIED** because (1) the ALJ adequately accounted for all of Ms. Bess's limitations in the RFC during the relevant period; and (2) substantial evidence supports the ALJ's credibility finding as to Ms. Bess based on the factors provided in *Craig v. Chater* and 20 C.F.R. 404.1529.

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

## II.  FACTS

**A. Procedural History**

On April 16, 2010, Ms. Bess applied for DIB alleging an onset of disability of March 3, 2006, due to arthritis, headaches, neck and back problems, knee injury, and legs, hips, and arms problems. (R. 172, 176.) The application for benefits was initially denied on August 13, 2010, and upon reconsideration on January 14, 2011. (R. 85-95.) Ms. Bess requested a hearing before an Administrative Law Judge ("ALJ"), which was held on March 14, 2012. (R. 14, 37-84.) Ms. Bess, who was represented by counsel, testified at the hearing, as did as did an impartial Vocational Expert ("VE"). (R. 37-84.) On April 6, 2012, the ALJ issued an unfavorable decision finding that Ms. Bess was not disabled. (5-33. 13.) On May 15, 2012, Ms. Bess appealed this decision to the Appeals Council, which denied review of the ALJ's decision on June 12, 2013. (R. 1-6, 14.) Ms. Bess then timely brought her claim to this Court.

**B. Personal History**

Ms. Bess was born on February 21, 1964. She is single and has never had children. Ms. Bess dropped out of school in the tenth grade and began working full-time. For most of her career, Ms. Bess worked as an Electronic Systems Technician installing and servicing fire and security alarms. According to the record, Ms. Bess worked continuously for nearly thirty years before her initial knee injury in 2005.

**C. Medical History**

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's finding that Ms. Bess was not under a disability.

*1. Pre-Alleged Onset Date: July 2005 – February 2006*

On July 11, 2005, Plaintiff complained of left knee pain after two games of softball. (R. 279.) One August 2, 2005, Plaintiff underwent a arthroscopic partial medial meniscectomy to repair a medial meniscus tear in her left knee. (R. 264.) On September 6, 2005, Plaintiff underwent a post-surgery examination by Dr. Kenneth Tepper, M.D. Dr. Tepper noted that Plaintiff complained of anterior knee pain as well as discomfort in her neck with pain moving down her arms. (R. 269.) During a susequent examination later in September 2005, Plaintiff expressed discomfort within her groin. (R. 271.) On September 27, 2005, after a MRI, Dr. Coleene Cooke, M.D., found Plaintiff had a reversal of the cervical curve, spondylosis and/or disk bulge from C3-4 through C6-7, a mild cord compression, and mild central canal stenosis C3-4. (R. 258.) Dr. Cooke observed mild C3-4 bilateral narrowing and mild right foramina narrowing C4-5. (*Id.*) Further, Dr. Cooke observed moderate bilateral foraminal narrowing of the C5-6 and C6-7. (*Id.*) On November 22, 2005, Dr. Melinda-Ann Roth, M.D., diagnosed Plaintiff with cervical spondylosis with intermittent bilateral upper extremity

radicular symptoms. (R. 275.)

During a December 21, 2005 physical examination, Dr. Roth found Plaintiff's lumbar spine range of motion was full and pain-free with no evidence of SI joint restriction. (R. 281.) However, Plaintiff again complained of low back pain and burning pain through her lower body as well as some numbness and tingling. (*Id.*) Dr. Roth did find that the medial side of Plaintiff's left second toe was numb. (*Id.*) In January 2006, Plaintiff still reported increased pain in her lower back and episodes of feeling dizzy, lightheaded, and feeling nauseous. (R. 266.) Ms. Bess reported to Dr. Roth that because Plaintiff did not have a work related injury, her employer could no longer honor her requests for light assignments. (R. 268.) At this time, according to Plaintiff's mother, Plaintiff and her mother moved to West Virginia and purchased a home. (R. 236-37.)

*2. The "Relevant Time Period": March 2006 – December 2011*

On July 21, 2010, Plaintiff underwent a physical evaluation by Dr. Aturo Sabio, M.D., in Huntington, West Virginia. Dr (R. 243.) Dr. Sabio observed Plaintiff:

> is able to walk with a normal gait. She did not require any ambulatory aids. There is no tenderness on the spine. There is no kyphosis or scoliosis. The left knee is well healed, but it was quite stiff. It cannot be fully extended. There is a weakness of the left handgrip at 14 kg of force and the right handgrip at 8 kg force. . . . There was no numbness or paresthesia in the extremities. Deep tendon reflexes were normal.

(R. 347.) On September 29, 2010, Plaintiff was examined by Dr. Joseph Dawson, D.O. (R. 358.) Again, Plaintiff complained of neck pain, pain radiating down both her arms and hands, and hip pain. *Id.* On October 12, 2012, Plaintiff underwent a lumbar and cervical MRI examination. (R. 362.) The lumbar MRI revealed (1) prominent degenerative disc disease in the lowest two lumbar segments; (2) a presence of the lateral recess narrowing; (3) disc herniation present with broad base

4

bulge at L4-L5 and apparent functional lumbosacral segment*;* (4) evidence of neural foraminal encroachment; (5) and a left sided disc protrusion at the L3-L4 level. (*Id.*) The cervical MRI revealed (1) severe degenerative change with degenerative disc disease; (2) likely upper thoracic disc herniation; (3) spondylosis; (4) nerve root impingement at numerous cervical levels due to degenerative disc change, reversal of the normal curve, and uncovertebral joint hypertrophy. (R. 363.) Additionally, Dr. Dawson suggested neurosurgical consultation. (*Id.*)

After the two MRI's, Plaintiff was referred to neurosurgeon Dr. Julian Bailes, M.D. (R. 368.) An additional cervical MRI was conducted on April 4, 2011. (R. 459.) The attending physician, Dr. Jeffrey Hogg, M.D., opined that Plaintiff suffered from "[m]oderate-to-advanced acquired degenerative changes which results in multilevel central canal and foraminal narrowing due to moderate disk bulge and moderate endplate osteophytes . . . [yet] [n]o hyperintense signal in the spinal cord is identified." (*Id.*)

On May 3, 2011, Plaintiff underwent C6-C7 microdiskectomy, osteophytectomy, allograft, and plate fusion surgery. (R. 425.) On June 27, 2011, during an post-surgery examination, Dr. Bailes remarked that Plaintiff still complained of neck stiffness and a limited range of motion, yet Plaintiff's "shooting pain into both hands and fingers has resolved." (R. 473.) Further, "[m]otor, sensory, and reflex testing are within normal limits. Cervical radiograph shows excellent alignment and good early fusion." (R. 474.) Yet, by September 30, 2011, Plaintiff again complained of numbness and burning in her hands as well as numbness near her abdomen. (R. 602.)

On October 25, 2011, Plaintiff underwent a left carpal tunnel release procedure by Dr. Sanjay Bhata, M.D., to address the "persistent burning in her left hand as well as left hand weakness . . . ." (R. 577.). During a post-operation examination in November 2011, Dr. Bhata noted that Plaintiff's

5

symptoms have improved but she continues to have weakness in her hand." (R. 601.)

*3. Post-Date Last Insured: January 2012 – October 2012*

On January 9, 2012, Plaintiff was referred by her attorney, Montie Van Nostrand, Esq., to be psychologically evaluated to assist in determining eligibility for Social Security disability benefits. (R. 503.) Based on the psychologist's diagnosis of "Major Depressive Disorder," the psychologist noted that Ms. Bess would have a moderate limitation to tolerate ordinary work stress. (R. 509-14.)

On February 3, 2012, during another post-surgery examination with Dr. Bhata, Plaintiff indicated her carpel tunnel procedure has improved her pain and numbness by "about 30%." (R. 601.) On February 25, 2012, Dr. Dawson completed a "Primary Care Physician Questionnaire." (R. 554.) On this questionnaire, Dr. Dawson opined that, during activity in an eight hour day, Plaintiff needs frequent position changes every thirty minutes to one hour. (R. 556.) Further, Plaintiff could only stand on her feet for only one hour. (R. 557.)

Dr. Dawson referred Plaintiff to Dr. Wassim Saikali, M.D., a Board Certified Rheumatologist. (R. 593.) Dr. Saikali examined Plaintiff on February 29, 2012. (*Id.*) Dr. Saikali noted "Plaintiff does have fibromyalgia." (*Id.*) A cervical (neck) collar was prescribed to Plaintiff on May 25, 2012 due to continued "neck, interscapular, and bilateral hand pain." (R. 606.) On August 13, 2012, during an examination by Dr. Kim Chong, M.D., Plaintiff again complained of pain in her neck and both arms and frequent headaches. (R. 608.)

**D. Testimonial Evidence**

Testimony was taken at the hearing held on March 14, 2012. The following portions of the testimony are relevant to the disposition of the case:

Ms. Bess testified that she is single with no children, and lives with her mother in a modular home in West Virginia. (R. 46.) She testified that she gained a significant amount of weight since she stopped working due to an inability to exercise rigorously. (R. 45-45.) Ms. Bess drives only when she "absolutely [has] to." (R. 47.) She has obtained a GED. *Id.* Ms. Bess testified that she receives no income and only collects $200 worth of food stamps per month. *Id.* She also testified that her mother does most of the cooking, shopping, and domestic chores. (R. 55-56.)

Plaintiff testified that she is unable to work. She testified that she has to frequently sit or lay down and is unable to stand for long periods of time. (*Id.*) Periodically, she'll feel "burning pain down [her] arms and . . . shake." *Id.* Ms. Bess testified that the inability to use her arms effectively and frequent headaches are the largest obstacles that interfere with her work ability. (R. 51.) In regard to Plaintiff's headaches, she testified they began in August 2005 during an incident with a "traction unit" while Ms. Bess was receiving physical therapy. (R. 52.) She testified that she didn't take any medication from "the middle of 2006 until 2010." (R. 56.)

Ms. Bess testified that she wears a neck brace whenever she leaves her home. (R. 59.) When asked about moving her head without the collar, Plaintiff testified that if she turns her head too fast, her arms will go numb and shooting pain will move down her arms. (R. 59-60.) Additionally, Plaintiff testified that she'll also feel pain when she attempts to move her head up or down. (R. 61.)

The ALJ questioned Plaintiff about the shooting pain in her arms. Ms. Bess testified that afer her May 2011 procedure, the shooting pain in her arms decreased, but "only when I'm not doing anything at all." (R. 68.) Citing exhibit 24-F, the ALJ questioned Plaintiff why several post-surgery physical examinations indicated Plaintiff's shooting pain has resolved. (R. 69.) Ms. Bess testified that she never told doctors that her shooting pain "was completely resolved." (*Id.*)

7

Eugene Czuczman, an impartial vocational expert, also appeared and gave testimony at the hearing. The ALJ posed the following hypothetical to the VE:

> [A]ssume a hypothetical individual of the same age, education, and work experience as the claimant who retains the capacity to perform light work with a sit/stand option allowing the person to briefly for 1-2 minutes alternate sitting or standing positions at 30-minute intervals without going off-task.
>
> Limited to no foot control operation bilaterally except no climbing of ladders, ropes or scaffolds. Frequent reaching and overhead reaching bilaterally, handling, fingering and feeling bilaterally.
>
> Avoid concentrated exposure to extreme cold and heat, excessive vibration. Avoid all exposure to unprotected heights, hazardous machinery and commercial driving. Limited to simple, routine, and repetitive tasks requiring only simple decisions free of fast-paced production requirements with few workplace changes. Can such an individual perform the past work of the claimant as it was actually performed or as it is customarily performed per the DOT?

(R. 73.) After establishing that such a hypothetical person could not perform Ms. Bess's past work, the ALJ asked whether other jobs existed in the regional or national economy that such a person could perform. *Id.* The VE listed three light, SVP-2, unskilled positions. (*Id.*) Those positions were: Photographic machine operator (207.685-018); Inserting machine operator (208.685-018); and Collator operator (208.685-010). (*Id.*) Additionally, the VE testified that the same three jobs would be available if the hypothetical was limited to frequent rotations, flexion, or extension of the neck. (*Id.*)

The ALJ then asked about customary policies with regard to employee tardiness and absences. The VE testified that a person could be tardy twice a week up to ten minutes each time before being terminated. (R. 74.) The VE also testified that a person could be absent two times a month or less and would not be terminated. (*Id.*) Further, an employee would receive a fifteen

8

minute break in the morning, a thirty minute break for lunch, and a fifteen minute break in the afternoon. *Id.* In addition, the VE stated that a typical employer would permit an individual to be off-task during work hours no more than ten percent of the time. (R. 75.) After the VE gave his occupational testimony, the ALJ asked whether "all your testimony today has been consistent to and in accordance with DOT?" (*Id.*) The VE answered that it had been. (*Id.*)

### III. ALJ FINDINGS

In determining whether Ms. Bess was disabled, the ALJ followed the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520. The first step in the process is determining whether a claimant is currently engaged in substantial gainful employment ("SGA"). *Id.* § 404.1520(b). If the claimant is not engaging in SGA, then the second step requires the ALJ to determine whether the claimant has a medically determinable impairment that is severe or a combination of impairments that are severe. *Id.* § 404.1520(c). If the claimant has a severe impairment or combination of impairments, then the analysis moves to the third step in the sequence, which requires the ALJ to determine whether the claimant's impairments or combination of impairments is of a severity to meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). *Id.* § 404.1520(d). If an impairment is of a severity to meet or equal a listed impairment, then the claimant is disabled. However, if the impairment does not meet or equal a listed impairment, the ALJ must determine the claimant's residual functional capacity ("RFC"), which is the claimant's ability to do physical and mental work activities on a sustained basis despite the limitations of her impairments. *Id.* § 404.1520(e). After determining the claimant's RFC, the ALJ must determine, at step four, whether the claimant has the RFC to perform the requirements of her past relevant work. *Id.* § 404.1520(f). If the claimant does not have the RFC

to do her past relevant work, then she has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, at the final step in the process, that other work exists in significant numbers in the national economy that the claimant can do, given the claimant's RFC, age, education, and work experiences. *Id*. § 404.1520(f); *see also McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir.1983).

Here, as a preliminary matter, the ALJ determined that Ms. Bess met the insured status requirements for disability insurance through December 31, 2011. At step one of the sequential process, the ALJ found that Ms. Bess had not engaged in SGA during the period from her alleged onset date of March 3, 2006, through her date of last insured of December 31, 2011. At step two, the ALJ found that Ms. Bess had the following severe impairments: arthritis; multi-level cervical degenerative joint disease (or degenerative disc disease); multi-level lumbosacral degenerative joint disease (or degenerative disc disease); remote medial meniscus tear in the left knee, status post operative arthroscopic partial medial meniscectomy with continued complaints of pain and restricted range of motion; bilateral carpal tunnel syndrome, status postoperative left carpel tunnel release surgery; and obesity. The ALJ also found that Ms. Bess had the following non-severe impairments: hyperlipidemia; hypercholesterolemia; a fatty liver; gastroesophageal reflux disease (GERD); and depression. At the third step, the ALJ found that none of Ms. Bess's impairments met or medically equaled the severity of any of the impairments contained in the Listings. In order to consider step four of the process, the ALJ determined that from her alleged onset date through her date of last insured, Ms. Bess has had the RFC to perform a range of work activity that:

> requires no more than light work as defined in 20 CFR 404.1567(b); requires a sit/stand option allowing the claimant to briefly, for 1 to 2 minutes, alternate sitting or standing positions at thirty (30) minute intervals without going off task; involves no foot control operations

> bilaterally; involves no more than occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching, or crawling; involves no climbing of ladders, ropes or scaffolds; involves no more than frequent reaching and overhead reaching bilaterally; involves no more than frequent handling, fingering and feeling bilaterally; avoids concentrated exposure to extreme cold and heat, as well as excessive vibration; avoids all exposure to unprotected heights, hazardous machinery and commercial driving; limited to work that involves simple, routine and repetitive tasks requiring only simple decisions, free of fast-paced production requirements with few workplace changes due to pain; and involves no more than frequent rotation, flexion and extension of the neck.

At step four, the ALJ found that through the date last insured, Ms. Bess was unable to perform any of her past relevant work because the requirements of her past relevant work exceed her RFC. Finally, in step five, the ALJ found that, considering Ms. Bess's age, education, work experience, and RFC, there were several jobs that existed in significant numbers in the national economy that she could have performed through her date last insured. Accordingly, the ALJ found that Ms. Bess was not under a disability at any time from March 3, 2006, the alleged onset date, through December 31, 2011, the date last insured.

### IV. THE MOTIONS FOR SUMMARY JUDGMENT

#### A. Contentions of the Parties

Ms. Bess contends that the ALJ failed to properly consider her alleged diagnosis of fibromyalgia and that this failure resulted in an improper RFC assessment. Additionally, she argues that the ALJ erroneously assessed her credibility. The Commissioner maintains that the ALJ properly considered Ms. Bess's alleged fibromyalgia and accurately assessed her RFC, and that the ALJ properly assessed Ms. Bess's credibility.

#### B. The Standards

*1. Summary Judgment*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## 2. Judicial Review

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 664-65 (1988); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

3. *Social Security - Claimant's Credibility*

"Because he had the opportunity to observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D. Va. 1976)). "We will reverse an ALJ's credibility determination only if the Claimant can show it was 'patently wrong'" *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (quoting *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990)).

**C. Discussion**

*1. Whether the ALJ Properly Considered Fibromyalgia?*

The bulk of Ms. Bess's argument surrounds the ALJ's consideration of fibromyalgia. Ms. Bess argues that the ALJ (1) failed to find that fibromyalgia was a medically determinable impairment in violation of SSR 12-2p; (2) failed to find that fibromyalgia was a severe impairment; and (3) failed to include fibromyalgia in the combination of non-severe and severe impairments for purposes of determining her RFC.

After the ALJ issued his decision on April 6, 2012, but before Ms. Bess's appeal of that decision was denied by the Appeals Council on June 12, 2013, the Social Security Administration ("SSA") published SSR 12–2p. The Ruling, which took effect on July 25, 2012, "provide[s] guidance on how [the agency] develop[s] evidence to establish that a person has a medically determinable impairment of fibromyalgia" and how the agency evaluates the limiting effects of the impairment. SSR 12–2p, 2012 WL 3104869 (2012). The Commissioner appears to concede that SSR 12-2p applies to the ALJ's decision, and argues that the ALJ complied with the Ruling in determining that Ms. Bess did not suffer from fibromyalgia.

13

According to SSR 12-2p, two different criteria may be used for determining fibromyalgia. SSR 12–2p, 2012 WL 3104869. The first is the 1990 American College of Rheumatology Criteria. *Id.* Under this criteria, a person may be found to have fibromyalgia if a person has:

> 1. A history of widespread pain—that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present.
>
> 2. At least 11 positive tender points on physical examination . . . . The positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist.[5]
>
> 3. Evidence that other disorders that could cause the symptoms or signs were excluded. Other physical and mental disorders may have symptoms or signs that are the same or similar to those resulting from FM. Therefore, it is common in cases involving FM to find evidence of examinations and testing that rule out other disorders that could account for the person's symptoms and signs. Laboratory testing may include imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor).

*Id.* The second criteria, the 2010 ACR Preliminary Diagnostic Criteria follows only a slightly modified version. The 2010 version finds a person may have fibromyalgia if a person has:

> 1. A history of widespread pain . . . ;
>
> 2. Repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and
>
> 3. Evidence that other disorders that could cause these repeated

---

[5] The 18 tender point sites include: occiput (base of the skull); low cervical spine (back and side of the neck); trapezius muscle (shoulder); supraspinatus muscle (near the shoulder blade); second rib (top of the rib cage near the sternum or breast bone); lateral epicondyle (outer aspect of the elbow); gluteal (top of buttock); great trochanter (below the hip); and inner aspect of the knee. SSR 12–2p, 2012 WL 3104869 (2012).

> manifestations of symptoms, signs, or co-occurring conditions were
> excluded . . . .

*Id.*

The ALJ noted that the only evidence that can be reviewed is evidence that existed prior to the date last insured. In this case, the date last insured was December 31, 2011. (R. 18.) Thus, evidence, such as Dr. Saikali's Febrary 29, 2012 observation that "Plaintiff does have fibromyalgia" cannot be used in the ALJ's analysis and ultimate determination in this matter.

In the ALJ's five-step analysis, the ALJ found that Plaintiff "had the residual functional capacity to perform a range of work activity that . . . requires no more than light work as defined in 20 C.F.R. 404.1567(b) . . . ." (R. 23.) The ALJ writes that:

> The foregoing evidence does indicate the element to have some
> degree of impairment that are likely to impose some limitations on
> her functioning, but the claimant has a treatment history that simply
> fails to demonstrate a condition or combination of conditions to the
> degree of severity that she has <u>alleged at this time</u>.

(R. 28) (emphasis added).

In making this conclusion, the ALJ cites several observations made by various doctor's in Plaintiff's medical history. First, the ALJ noted that "[f]rom approximately mid-2006 through mid-2010 . . . claimant discontinued all medical care for her alleged disabling impairments . . . ." (R. 26.) The ALJ cites Dr. Sabio's 2010 observation that Plaintiff "is able to walk with a normal gait . . . and did not require any ambulatory aids." (R. 26, 347.) After her May 3, 2011 surgery, Dr. Bailes believed that Plaintiff's "shooting pain into both hands ha[d] resolved." (R. 27, 473.)

Under SSR 12-2p, an adjudicator must "review the physician's treatment notes" to see if they compare with symptoms of fibromyalgia. SSR 12–2p, 2012 WL 3104869 (2012). Important factors to note is whether the symptoms are "consistent . . . . [and] have improved, worsened, or remained

stable." *Id.* Here, the ALJ detailed Plaintiff's consistent complaints of neck and back pain, shooting pain down her arms, and occasional headaches. (R. 26-28.) However, the ALJ also indicated several periods in Plaintiff's medical history in which her condition improved, her hand pain had briefly resolved, and was walking normally. *Id.* It's uncontested that Plaintiff's medical history is exhaustive, nevertheless, the ALJ can only analyze the relevant record between March 2006 to December 2011. In reviewing the record from that time, the ALJ concluded that claimant had residual functional capacity to perform light work. (R. 23.)

The Court cannot substitute its judgement for that of the ALJ. "Substantial evidence is that which a 'reasonable mind might accept as adequate to support a conclusion.'" *Hays*, 907 F.2d at 1456 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "[T]he the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966). Thus, under this Court's limited review, ALJ's determination was supported by substantial evidence.

## 2. Whether the ALJ Properly Determined Ms. Bess's Credibility

Ms. Bess argues that the ALJ improperly discredited her allegations of her pain and its effect on her ability to sustain a normal work day without excessive rest breaks. A two-part test is used for evaluating the limiting effects of subjective symptoms, such as pain, fatigue, shortness of breath, and weakness. *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996); 20 C.F.R. 404.1529. First, objective medical evidence must show the existence of a medical determinable impairment "'which could reasonably be expected to produce' the actual pain, in the amount and degree, alleged by the claimant." *Craig*, at 594 (quoting 20 C.F.R. 404.1529(b)). In other words, "no symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the

individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms." SSR 96-7p, 1996 WL 474186. Second, after the claimant has met this threshold obligation of showing an impairment reasonably likely to cause the pain claimed, the adjudicator must evaluate the intensity, persistence, and limiting effects of the claimant's pain and other symptoms in order to determine the extent to which they affect her ability to work. *Craig*, at 595; 20 C.F.R. 404.1529(c)(1); SSR 96-7p. In making this evaluation, the ALJ must consider all of the available evidence, including "the claimant's medical history, medical signs, and laboratory findings . . . any objective medical evidence of pain...and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *Craig*, at 595 (internal citations omitted).

While objective medical evidence of pain, such as such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, and redness, "is a useful indicator...in making reasonable conclusions about the intensity and persistence of [a claimant's] symptoms and the effect those symptoms, such as pain, may have on [a claimant's] ability to work," 20 C.F.R. 404.1529(c)(2), in many cases, symptoms, such as pain, "suggest a greater severity of impairment than can be shown by objective medical evidence alone." SSR 96-7p; *see also Craig*, 76 F. 3d at 595 ("[B]ecause pain is subjective and cannot always be confirmed by objective indicia, claims of disabling pain may not be rejected *solely* because the available objective evidence does not substantiate the claimant's statements as to the severity and persistence of her pain.") (emphasis in original). "If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence,

17

the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms. The adjudicator must then make a finding on the credibility of the individual's statements about symptoms and their functional effects." *Id*.

The regulations set forth certain factors for the adjudicator to consider to determine the extent to which the symptoms limit the claimant's capacity to work:

> 1) The individual's daily activities; 2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) Factors that precipitate and aggravate the symptoms; 4) Type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and 7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. 404.1529(c). Accompanying factors that the adjudicator must also consider when assessing the credibility of an individual's statements are provided in SSR 96-7p. These factors include medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions provided by medical sources; and statements and reports about claimant's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the claimant's symptoms and how the symptoms affect the individual's ability to work. SSR 96-7p.

The record illustrates that the ALJ evaluated Claimant's symptoms in accordance with the two-part test in *Craig* and the factors outlined in 20 C.F.R. 404.1529 and SSR 96-7p. In step one of the *Craig* test, the ALJ found that Ms. Bess had "medically determinable impairments [that] could

18

reasonably be expected to cause at least some of her alleged symptoms . . . ." Next, in accordance with the factors set out in 20 C.F.R. 404.1529 and SSR 96-7p, the ALJ considered whether Mr. Smith's subjective statements regarding his symptoms were substantiated by, or conflicted with, the objective evidence in the record, and found that Ms. Bess's statements "are not credible to the extent they are inconsistent with the medical evidence of record and the above residual functional capacity assessment."

Here, the ALJ noted that Ms. Bess complained of debilitating pain in her head, back, neck, arms, and hands that worsens with activity and precludes her from doing any activity, including sitting, standing, or walking, for more than five to ten minutes before needing to stop and rest. The ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause at least some of her alleged symptoms; however, the claimant's statements (and those of witnesses who submitted statements on the claimant's behalf) concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent they are inconsistent with the medical evidence of record and the above residual functional capacity assessment." Next, the ALJ outlined the medical evidence of record and determined that "[t]he foregoing evidence does indicate the claimant to have some degree of impairments that are likely to impose some limitation on her functioning, but the claimant has a treatment history that simply fails to demonstrate a condition or combination of conditions of the degree of severity that she has alleged at this time."

From a thorough review of the record, it is clear Plaintiff has suffered from many of the alleged symptoms located in the medical record. Yet, "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984). Based on the limited reviewing power of this Court,

the record supports that the ALJ used substantial evidence in his decision and was not "patently wrong" in his analysis. *Powers* at 435.

## IV.  RECOMMENDATION

In reviewing the record, the Court concludes that the ALJ's decision was based on substantial evidence, and **RECOMMENDS THAT**:

1. Ms. Bess's Motion for Summary Judgment be **DENIED**; and

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985): *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

DATED: August 15, 2014 /s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE